IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

WILLIAM FRANCIS HARRIS, SR.,           §
                                       §
          *Petitioner*,                §
                                       §
v.                                     §          CIVIL ACTION NO. H-06-0626
                                       §
NATHANIEL QUARTERMAN,                  §
                                       §
          *Respondent*.                §

## MEMORANDUM OPINION AND ORDER

William Francis Harris, Sr., a state inmate represented by counsel[1] and proceeding *in forma pauperis*, seeks habeas relief under 28 U.S.C. § 2254 challenging his state felony conviction for murder. Respondent filed a motion for summary judgment (Docket Entry No. 17), to which petitioner responded (Docket Entry No. 20).

Based on consideration of the pleadings, the motion and response, the record, and the applicable law, the Court will grant summary judgment and dismiss this case.

## I.   PROCEDURAL BACKGROUND

The jury convicted petitioner of murdering his estranged wife and assessed punishment at sixty-five years incarceration. The conviction was affirmed on appeal. *Harris v. State*, 133 S.W.3d 760 (Tex. App. – Texarkana 2004, pet. ref'd). The Texas Court of Criminal Appeals refused discretionary review, *Harris v. State*, PDR No. 447-04, and denied

---

[1]Petitioner filed his habeas petition *pro se*. He subsequently retained counsel, who filed a response to the summary judgment motion.

state habeas relief without a written order on findings of the trial court without a hearing.

*Ex parte Harris*, No. 63,563-01.

Petitioner raises the following grounds for federal habeas relief:

(1)    actual innocence due to legally insufficient evidence;

(2)    lack of a warrant or probable cause for the arrest;

(3)    ineffective assistance of trial counsel;

(4)    ineffective assistance of appellate counsel;

(5)    evidentiary errors by the trial court; and

(6)    improper use of extraneous offenses.

Respondent argues that all of these grounds fail as a matter of law.

## II.   FACTUAL BACKGROUND

The state appellate court set forth the following statements of facts in its opinion:

The evidence, viewed in a neutral light, shows the following: Police found a woman's body on the early afternoon of Sunday, March 4, 2001.  The body was located behind a trash dumpster near the former headquarters of the old Dryper's diaper corporation in north Houston.  The body was that of a black female, not wearing shoes, her belt undone, and her pants partially unzipped. Police found no blood around the body.  The woman was ultimately identified as Wenona Harris.

Roger Milton, M.D., an assistant medical examiner at the Harris County Medical Examiner's office, performed the autopsy.  He concluded Wenona died as a result of strangulation.

Before her death, Wenona lived in Texas City, Texas.  Rashand Malvo was Wenona's neighbor at the Lakewood Apartments.  Malvo testified he believed Wenona lived in her apartment with her son and Harris.  Malvo stated he saw

2

Harris leave Wenona's apartment between 11:30 and 11:40 a.m. Saturday, March 3, 2001. A few moments later, Malvo saw Harris again, this time as he was being shown around the apartments by a leasing agent. Malvo also testified he remembered Harris drove a black Lincoln Navigator sport utility vehicle.

Evangeline Blevins, a leasing agent who worked at the Lakeview Apartments at the time of Wenona's murder, testified she showed an African-American male around the complex Saturday, March 3, 2001. At trial, Blevins could not independently remember the name of the man to whom she had shown the apartment, but did identify the person shown on Harris' driver's license as the same person to whom she had shown the apartment. [FN4. According to Blevins' testimony, the man claimed he was renting an apartment on his mother's behalf. Before showing the apartment, Blevins made a photocopy of the man's driver's license. That photocopy was introduced into evidence at trial. The photocopy showed Harris' driver's license.] That man had specifically asked to see apartment number 1808, located next door to Wenona's apartment. Eventually, the man left a deposit check with Blevins for apartment number 1808. That deposit check– admitted into evidence at trial– was drawn on a bank account belonging to 'William Harris.' On Monday, March 5, 2001, Blevins received a call from the man to whom she had leased apartment 1808; he said he no longer wanted the apartment.

Misty and Betty Leiber testified they had driven to the Lakeview Apartments in Texas City to pick up a friend for lunch Saturday, March 3, 2001. They arrived between 2:30 p.m. and 3:00 p.m. While they waited for their friend, both observed an African-American male coming down the walkway in front of their friend's apartment. (Betty testified she thought the man was approximately six feet tall.) [FN5. The photocopy of Harris' driver's license lists Harris' height as five feet, eleven inches.] Both Misty and Betty initially thought the man was doing laundry because they observed him carrying what looked like a big bundle of laundry inside either sheets or a large comforter over his right shoulder. But as they watched the man, Misty and Betty saw a human arm extend from the bundle. Through the linens, Betty and Misty thought they saw a body clothed in a dark-colored or striped shirt. [FN6. The jury had already seen police photographs of Wenona, showing her clothed in a dark-colored shirt at the time police found her body.] Misty believed the arm was that of 'either a small black woman or a bigger child that was Hispanic or black[.]' Betty described the arm as thin and darkly tanned. 'It could have

3

been like a light-skinned black person or Mexican.  I couldn't really tell.'
Betty also said she believed the arm was that of either a woman or a child.

Misty saw the man put the bundle into a vehicle she described as a dirty, black
sport utility vehicle.  Before the SUV sped away from the scene, Misty wrote
down the SUV's license plate number, 4TPJ44.  Misty said she saw 'the back
of the [body's] head hit the window with the arm up' when the man put the
body into the SUV.'  But he [the driver] pulled it [the arm] down to where it
wasn't there anymore.'  At trial, Misty identified Harris as the man she had
seen carrying what she thought was a body wrapped inside the sheets or
comforter.  Betty, however, was unable to identify Harris, during either a
lineup at the police station or later at trial, as the man she saw carrying the
bundle.  [FN7. Houston attorney Michael Charlton was present during the
pretrial lineup proceedings.  He testified neither Betty nor Misty were initially
able to identify Harris as the person they saw carry a body to a black Lincoln
Navigator on March 3, 2001.  He did acknowledge, however, that Misty
eventually identified the man in position number two, Harris, as the person
most closely resembling the body type of the man she saw in the apartment
complex.  Charlton did not consider this to have been a positive identification
of Harris as the suspect.]  But when asked repeatedly at trial, Betty was certain
she never saw a child with the man who she had seen carrying the body and
who drove away in the black SUV.

Misty and Betty went to lunch, then went to the Texas City Police Department
to report the suspicious activity they had observed earlier at the Lakewood
Apartments.  The next day, someone from the police department followed up
on Betty's and Misty's information.  At that time, Misty gave Officer Brian
Goetscheius the piece of paper on which she had written the black SUV's
license plate number.  This paper was later admitted into evidence.  The paper
shows a handwritten notation of '4tP J44.'

Sergeant Robert Elliot of the Texas City Police Department testified a man
named 'William Harris' was the registered owner of a black Lincoln Navigator
SUV with license plates 4TPJ44.  Elliot also told the jury about his search of
Harris' SUV.  Using Luminol, [FN8. Luminol is a substance that reacts to the
presence of blood, making blood which is otherwise invisible to the naked eye,
visible] Elliot found evidence of blood on the floor mats.  He collected the
floor mats and submitted them to the forensics laboratory of the Houston
Police Department for further testing.  Elliot, however, did not know whether

4

the floor mats ever received further testing at the Houston Police Department. Regardless, the State presented no evidence of such an analysis. [FN9. Luminol testing is not accepted as a positive testing for blood. Luminol testing merely establishes a presumption that blood is present. Luminol also reacts to the presence of substances other than blood.] Elliot also found no evidence of the victim's hair or fingerprints inside Harris' SUV.

At 4:00 p.m. Saturday afternoon, Harris took his son Jyron to Lucy Smith's home in Galveston. [FN10. Jyron is the son of Harris and Wenona.] Harris left Jyron in Smith's care. [FN11. Smith is the great aunt and primary caregiver of Harris' other son, William. The younger William is not related to Wenona.] Smith said Harris told her the following morning he had gone to Houston to drop something off. Later that day, Smith and Jyron went to eat with Cardena Fontenette (Smith's daughter) at a local restaurant. Smith told the jury she did not believe Harris had been behaving unusually during the weekend Wenona was killed.

Fontenette testified Harris came to see her at work the afternoon of Sunday, March 4, 2001. Harris arrived in his Lincoln Navigator and asked to use Fontenette's vehicle. Harris said he needed to go to Galveston and see what was happening regarding Wenona. He also told Fontenette he had a warrant out for his arrest. Fontenette allowed Harris to exchange his Navigator for her car, as it had been their custom to share vehicles in the past.

Harris left, but later used his cell phone to call Fontenette. During that call, Fontenette informed Harris that the police were looking for him at his home and that Harris should go speak with them. Harris told Fontenette he would talk to the police. Fontenette then went to Galveston, picked up Jyron, and took him to the police station. Fontenette then left the Lincoln Navigator at a friend's home.

At trial, Fontenette said Harris had told her that he had been to the casino in Louisiana Saturday night and that, based on his physical appearance, she believed the story was consistent with his physical appearance. She also said Harris had consistently denied being involved in Wenona's death.

Another witness, Mary Jackson, [FN12. Jackson is Wenona's aunt] testified that, before Valentine's Day 2001, Harris told her he was going to ask one of the deputy sheriffs to lock him up so he would not be able to harm Wenona.

Jackson later found out Harris admitted himself to the psychiatric unit of a hospital because he was having homicidal thoughts.

Ifeoma Arena, M.D., a resident in psychiatry at the University of Texas Medical Branch (UTMB) in Galveston, interviewed Harris February 12, 2001, when he admitted himself to that facility.  Harris told Arena he had been having thoughts of killing Wenona by strangulation or by shooting her with a gun.  He said he could snap at any time.  He also told Arena he spent most of his day following Wenona, watching her, and checking on where she was going.  Harris was upset that Wenona had a new boyfriend.  Arena recalled Harris saying he had a key to Wenona's apartment.  Even though Harris presented no acute psychosis, Arena admitted Harris for depression and further evaluation.  Harris' medical records, admitted into evidence without objection, indicate he was admitted to the psychiatric unit for 'suicidal and homicidal precautions.'

Vanessa Vela, M.D., another psychiatry resident at UTMB-Galveston, saw Harris February 13, 2001.  Harris saw Vela and her team (including two medical students and a faculty physician) and seemed 'mildly distressed.'  Harris stated he admitted himself to the hospital the previous day due to concerns about (1) his pending divorce; (2) the fact his wife was dating another man; and (3) thoughts of arming himself and hurting his wife.  But on February 13, 2001, Harris reported he was no longer having those thoughts.  Vela stated the overnight change in Harris' demeanor was consistent with her experience: 'a lot of patients, once they are in the safety of the hospital, they do realize these thoughts are irrational and they are able to kind of think things through in a quiet, structured environment a long time.'  Harris' change was not the result of having been administered any medication.  Vela concluded, based on her observations, the patient interview, and Harris' psychiatric history, that Harris was not psychotic.  He appeared intelligent, articulate, capable of conversing, completely rational, and able to understand Vela's questions.   When Vela told Harris that his soon-to-be ex-wife was not interested in being a part of his psychiatric treatment, Harris said he was disappointed.  Vela prescribed Paxil for Harris' treatment.  According to Vela, Paxil usually takes four to six weeks to take effect and does not work for everyone.  Harris then checked out of the hospital.

When Jackson found out Harris had left the hospital, she called Wenona to warn her because Jackson feared 'he [Harris] might try to hurt her [Wenona].'

Testifying before the jury, Lashuana Hampton [FN13. Hampton is the deceased's sister] described Wenona as a woman with a thin build and a lighter skin complexion.   [FN14. Pictures of Wenona show her to be an African-American woman whose skin had a lighter shade of melanin.] Hampton testified about several incidents of family violence in which Harris injured Wenona.  These injuries included a black eye, bruises on Wenona's arms, and marks on Wenona's neck and back where Harris had scratched her. Hampton also told the jury that Harris had previously choked Wenona until she passed out and that he had struck her with a telephone.

Wenona had called Hampton during the early morning of Saturday, March 3, 2001.  Wenona wanted to bring Jyron to stay with Hampton.  She arrived at Hampton's house around 8:00 a.m., and Jyron stayed with Hampton until around 12:50 p.m. when Wenona returned to pick up Jyron.  At that time, Wenona was wearing a dark brown or dark black shirt made of stretchy material.  Hampton, Hampton's husband, and Wenona then took a table to Wenona's apartment.  Hampton left Wenona's apartment around 2:00 p.m., when Wenona planned to take a bath.  Hampton later returned to Wenona's apartment and knocked on the door, but neither Jyron nor Wenona answered. Hampton waited approximately ten minutes, but no one answered the door during that time.  She called Wenona's home telephone number around 4:00 p.m. and again at 10:00 p.m., but received no answer.

The victim's mother, Norsie Young, testified she last spoke with Wenona at 12:52 p.m. Saturday, March 3, 2001.  Young and Wenona had agreed to join other family members later that evening to celebrate Wenona's twenty-ninth birthday.  At 2:49 p.m., Harris called Young to tell her he was taking Jyron to Cardena's house and then heading to Coushatta, Louisiana, to gamble.

Wenona never arrived at the family celebration that evening.  Young and Wenona's other family members became concerned about Wenona's unexplained absence and began searching for her.  Young and her son went to Wenona's apartment that evening, but found neither Wenona nor Jyron, and they found no signs of a struggle at the apartment.  Young, however, believed it was strange that her daughter' car was still parked in the parking lot when Wenona was not at home.

Young called Harris Sunday morning regarding Wenona's disappearance. Harris denied knowing Wenona's whereabouts.  Young later called Harris a

second time and told him the police were looking for him because two of Wenona's neighbors had seen Harris allegedly carrying Wenona, wrapped in a sheet, from her apartment when Wenona's arm protruded from the sheet. According to Young's testimony, Harris denied being at Wenona's apartment, questioned whether the neighbors had actually seen Harris at Wenona's apartment, and eventually agreed to meet Young at the Texas City Police Department.  Harris, however, never showed up at the police station.

During the evening of Sunday, March 4, 2001, police were asked to go to Wenona's apartment regarding a missing person's report.  Once there, police gained entry through the assistance of a family member and 'processed' Wenona's apartment.  They found no sign of a forced entry.  They did find blood on some bed sheets, but the police later concluded this blood was consistent with menstrual blood.

On the evening of Saturday, March 3, 2001, Donney Caraway and Elicia Washington were waiting for a bus in north Houston to take them to a Louisiana casino.  After 9:00 p.m., Harris arrived at the pickup point for the bus and joined Caraway, Washington, and the other riders for the trip to the casino.  The bus left around 9:45 p.m.  The group rode to the casino, gambled, and returned several hours later.  Washington and Caraway described Harris as not being as lively as he had been on previous trips with them, but neither detected anything too unusual about his demeanor.

*Harris*, 133 S.W.3d at 766-770 (citations omitted).

### III.  THE APPLICABLE LEGAL STANDARDS

This petition is governed by applicable provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28 U.S.C. § 2254.  Under the AEDPA, federal relief cannot be granted on legal issues adjudicated on the merits in state court unless the state adjudication was contrary to clearly established federal law as determined by the Supreme Court, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court.  *Williams v. Taylor,* 529 U.S. 362, 404-05 (2000); 28

8

U.S.C. §§ 2254(d)(1), (2).  A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court or if it confronts a set of facts that are materially indistinguishable from a Supreme Court decision and arrives at a result different from the Supreme Court's precedent. *Early v. Packer*, 537 U.S. 3, 7-8 (2002).

A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams,* 529 U.S. at 409.  In deciding whether a state court's application was unreasonable, this Court considers whether the application was objectively unreasonable. *Id.* at 411.

The AEDPA affords deference to a state court's resolution of factual issues.  Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding.  *Miller-El v. Cockrell*, 537 U.S. 322, 343 (2003).  A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 330-31.

9

In responding to the motion for summary judgment on behalf of petitioner, petitioner's federal habeas counsel requests the Court to rely on petitioner's *pro se* memorandum of law filed with the state court. Petitioner's counsel provides no explanation for failing to set out petitioner's specific arguments here in the response to the motion for summary judgment. Nevertheless, in the interest of justice the Court will review the specific arguments petitioner himself raised in state court.

## IV.  INSUFFICIENT EVIDENCE AND ACTUAL INNOCENCE

Petitioner asserts actual innocence based on insufficiency of the evidence. On direct appeal, petitioner challenged the factual, but not the legal, sufficiency of the evidence. The state appellate court found the evidence factually sufficient to support the murder conviction. *Harris*, 133 S.W.3d at 770. For purposes of federal habeas review, "actual innocence" means factual innocence and not mere legal insufficiency of the evidence. *United States v. Jones*, 172 F.3d 381, 384 (5th Cir. 1999). To establish actual innocence, a petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him. *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995). That is, the inquiry is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Under the *Jackson* standard, the jury may disregard any evidence it chooses to disregard, as it is the jury's responsibility to resolve fairly conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts. *Id*. Any contradictory

10

testimony does not affect the validity of the guilty verdict. *Id*. The evidence can be sufficient to support a conviction under *Jackson* even when it also supports a claim of innocence. *See Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).

Petitioner was charged with murdering his wife by strangulation. A person commits murder when he intentionally or knowingly causes the death of another person. TEX. PEN.CODE § 19.02(b)(1). The evidence set forth by the state court of appeals in its opinion is itself enough to allow a rational trier of fact to convict petitioner of the allegations in the indictment and jury charge, and the evidence presented at trial was enough to defeat a legal sufficiency challenge in a Texas appellate court. *See King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).

Moreover, an independent review of the trial record reveals sufficient evidence under *Jackson* to sustain the conviction. The State established that a black male meeting petitioner's physical description was seen near complainant's apartment the day of her disappearance, carrying a bundle of laundry or bedspread with a human arm extending from the bundle. The witnesses described seeing a body inside the bundle clothed in a dark-colored or striped shirt. The man put the bundle inside a black SUV registered to petitioner. A witness identified petitioner as the man she saw carrying the bundle. Complainant's body was later found behind a dumpster, clothed in a dark-colored shirt. The State established prior incidents of family violence in which petitioner injured complainant. Witnesses testified that petitioner had stalked complainant, assaulted and choked her in the past, had

11

recent homicidal thoughts that prompted him to commit himself to a psychiatric hospital, and was seen at complainant's apartment complex the day of her disappearance, although he initially denied it. *Harris*, 133 S.W.3d at 770. Petitioner's challenge to the sufficiency of the evidence is without merit.

Regardless, a claim of actual innocence, standing alone, is insufficient to merit federal habeas relief. *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000). Federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution, not to correct errors of fact. *Herrera*, 506 U.S. at 400. There also must be evidence of an independent federal constitutional violation in the state criminal proceeding. *Dowthitt*, 230 F.3d at 741. A petitioner must establish that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt in light of all of the evidence, including that alleged to have been illegally admitted and evidence tenably claimed to have been wrongly excluded or to have become available only after trial. *Schlup*, 513 U.S. at 321.

In *Schlup*, the Supreme Court recognized the distinction between habeas petitioners who assert that their actual innocence in itself presents a violation of their constitutional rights (as in *Herrera*) and habeas petitioners who assert that their actual innocence acts as a catalyst to bring them within that narrow class of cases in which the refusal of the court to hear their underlying constitutional claims will result in a fundamental miscarriage of justice. 513 U.S. at 314-15. Actual innocence in this second type of petition is not itself a basis for

12

federal habeas relief; it is, however, "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id*. at 315.

To the extent petitioner claims actual innocence based on the constitutional errors raised in his petition, this Court has found no errors of constitutional dimension. *See Fahle v. Cornyn*, 231 F.3d 193, 196-97 (5th Cir. 2000). Respondent is entitled to summary judgment on petitioner's claims of actual innocence and insufficiency of the evidence.

## V.   LACK OF WARRANT OR PROBABLE CAUSE FOR ARREST

Petitioner asserts that his Fourth Amendment rights were violated when the police arrested him for his wife's murder without a warrant or probable cause. This claim cannot be raised in a federal habeas writ when the State has provided an opportunity for a full and fair litigation of the issue. *Stone v. Powell*, 428 U.S. 465, 494 (1976); *Moreno v. Dretke*, 450 F.3d 158, 167 (5th Cir. 2006). When a state provides the processes whereby a defendant can obtain full and fair litigation of a Fourth Amendment claim, *Stone* bars federal habeas corpus consideration of that claim whether or not the defendant employed those processes. *Janecka v. Cockrell*, 301 F.3d 316, 320 (5th Cir. 2002). In absence of allegations and proof that "the processes provided by a state to fully and fairly litigate fourth amendment claims are routinely or systematically applied in such a way as to prevent the actual litigation of fourth amendment claims on their merits," *Stone* forecloses review of petitioner's Fourth Amendment issues. *Moreno*, 450 F.3d at 167.

13

Petitioner makes no such allegations under *Moreno* in the instant case, and his Fourth

Amendment claims are barred.  Respondent is entitled to summary judgment on these issues.

## VI.  HEARSAY EVIDENCE

Petitioner claims that the trial court erred in construing and admitting into evidence

as excited utterances the hearsay testimony presented by witnesses Wilson and Anderson.

The state court of appeals summarized petitioner's complaint as follows:

> Harris contends the trial court erred by permitting two witnesses to testify
> about statements the victim made before her death about Harris' potential for
> domestic violence.  First, while watching a murder trial involving domestic
> violence, Wenona became very emotional and confided in her supervisor,
> Latonia Wilson, that Wenona believed Harris would kill her.  Second, during
> an interview for a protective order against Harris, Wenona told Ella Anderson,
> an assistant criminal district attorney from Galveston County, about prior
> occasions when Harris had assaulted her in the couple's household.  Harris
> argues the two statements admitted by the trial court did not fall within the
> excited utterance exception to the hearsay rule.

*Harris*, 133 S.W.3d at 770.  The state appellate court determined that Wilson's statement was

not improperly construed as an excited utterance under state law, but that the trial court

abused its discretion in admitting Anderson's statement as an excited utterance.  *Id*. at 772.

The appellate court then determined that the improper admission of Anderson's hearsay

testimony was harmless error:

> In this case, Anderson did not testify about the specifics of the assaultive
> offense that prompted Wenona to seek a protective order from her office.
> Another witness, however, did inform the jury about such specifics.  Hampton
> testified that, over a period of three years, Harris assaulted Wenona on several
> occasions.  In 1997, Harris threw a telephone at Wenona.  In 1998 or 1999,
> Harris hit Wenona with a telephone, causing a black eye.  Hampton also

recalled a separate occasion when she saw Wenona with bruises on her neck where Harris had choked her.  On appeal, Harris neither contends the trial court erred by admitting Hampton's testimony, nor did he specifically object to that evidence at trial.  Thus, in light of Hampton's more detailed testimony, we cannot say the erroneous admission of Anderson's otherwise generic description of the prior assault influenced the jury's verdict or had more than a slight effect, if any at all.

*Harris*, 133 S.W.3d at 770-773 (citations omitted).

It is well-established that federal courts possess only limited authority to consider state evidentiary determinations in a state prisoner's habeas proceeding.  *Burgett v. Texas,* 389 U.S. 109, 113-14 (1967).  As long as the evidentiary ruling is in accordance with state law and infringes no right protected under the Constitution, habeas relief is not warranted.  *Id. See also Robinson v. Whitley,* 2 F.3d 562, 566 (5th Cir. 1993).

This Court is bound by the state court's determination that Wilson's testimony was properly admitted under state law, and may only consider whether its admission violated petitioner's federal constitutional rights.  *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991). ("It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")  At trial, petitioner objected that Wilson's testimony did not qualify as excited utterances under state law.  Petitioner raised no objection based on a violation of his federal rights at the state level, and the issue was not fairly presented to the highest state court.  *See Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Wilder v. Cockrell*, 274 F.3d 255, 260 (5th Cir. 2001).  Accordingly, petitioner's federal claims regarding the evidence are unexhausted, procedurally defaulted, and barred from consideration by this Court.  *See*

15

*Hughes v. Dretke*, 412 F.3d 582, 595 (5th Cir.), *cert. denied*, __U.S.__, 126 S. Ct. 1347 (2006); *see also Neville v. Dretke*, 423 F.3d 474, 480 (5th Cir. 2005).

The state court, however, determined that Anderson's testimony constituted impermissible hearsay evidence.  Even assuming that admission of the evidence violated petitioner's constitutional rights, a constitutional trial error is not so harmful as to require habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict.  *Brecht v. Abrahamson,* 507 U.S. 619, 638 (1993)  It must have had a *substantial* effect or influence in determining the verdict.  Based upon its own careful review of the record and for those reasons espoused by the state appellate court, this Court agrees that the introduction of Anderson's testimony did not have a substantial and injurious effect or influence in determining the jury's verdict.

Despite the non-exhaustion and procedural default of his claim, petitioner now argues that the state appellate court's determinations of the hearsay and harm issues are contrary to and unreasonable applications of *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Petitioner's argument is groundless.  In *Crawford*, the Supreme Court recognized that the Confrontation Clause bars the admission of testimonial statements at trial where the declarant is unavailable and the defendant was unable to confront and cross-examine the declarant. The Supreme Court made clear that, as used in *Crawford*, the term "testimonial statements" applied to *ex parte* in-court testimony or its functional equivalent, such as affidavits, custodial examinations, depositions, and prior testimony that the defendant was unable to

16

cross-examine.  *Id.*, 541 U.S. at 51-52.  Nothing in the instant record shows, nor does petitioner specifically argue and demonstrate, that the complainant's statements constituted *testimonial* evidence.  Thus, the holding in *Crawford* is inapplicable to petitioner's confrontation claim.

Petitioner fails to show that the state court's determinations were contrary to or involved an unreasonable application of federal law or were unreasonable determinations of the facts based on the evidence in the record.  No basis for habeas relief is shown, and respondent is entitled to summary judgment on these issues.

## VII.  EXTRANEOUS OFFENSE EVIDENCE

Petitioner complains that the trial court erred in allowing into evidence the following evidence of extraneous offenses:

(a)     his statements appearing in his medical records regarding forgery of a check, making false identifications, and stalking his wife.  *Ex parte Harris*, p. 126; and

(b)     testimony of witnesses Lashauna Hampton and Ella Anderson as to petitioner's prior acts of violence against his wife.  *Id*.

The complained-of statements regarding petitioner's check forgery, false identifications, and stalking purportedly appear somewhere within the 207 pages of petitioner's medical records.  Petitioner does not direct the Court to the specific locations of these statements.  Regardless, the record shows, and the parties do not dispute, that petitioner did not raise extraneous offense objections to the medical records at trial, and the records

17

were admitted into evidence without objection.  S.F. Vol. 9, pp. 41-42.  Petitioner's failure to contemporaneously raise an extraneous offense objection to the medical records constitutes a form of procedural default, which serves as a barrier to federal habeas review of this claim.  *See Rowell v. Dretke*, 398 F.3d 370, 375-75 (5th Cir.), *cert. denied,* ___U.S. ___, 126 S. Ct. 103 (2005); *Graves v. Cockrell,* 351 F.3d 143, 152 (5th Cir. 2003).

A petitioner's procedural default can be excused in limited circumstances where the petitioner can demonstrate cause and actual prejudice for the default or that failure to address the merits of his procedurally defaulted claim will work a fundamental miscarriage of justice. *Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *Harris v. Reed*, 489 U.S. 255, 262 (1989). Petitioner neither argues nor shows cause and actual prejudice for the default or fundamental miscarriage of justice.  To the extent he contends that trial counsel's deficient performance caused the default, this Court addresses his argument under Part VIII, *infra*.

The Fifth Circuit recognizes that an extraneous offense may be admitted into evidence without violating due process if the prosecution makes a strong showing that the defendant committed the offense and if the extraneous offense is rationally connected with the offense charged.  *Story v. Collins*, 920 F.2d 1247, 1254 (5th Cir. 1991).  In this case, the source of the statements was petitioner himself; further, that petitioner stalked complainant prior to her murder was rationally connected with the murder itself.  Both of the *Story* requirements are met as to the stalking offense.  Moreover, Dr. Arena testified at trial that petitioner said he had been spending his days following complainant; thus, the medical records inclusion was

18

cumulative of that testimony. Although the offenses of check forgery and false identifications were not rationally related to the murder charge, the erroneous admission of extraneous offense evidence does not merit federal habeas relief unless the evidence is a crucial, critical, highly significant factor that renders the entire trial fundamentally unfair. Even assuming the jury's awareness of the statements appearing within the medical records, the extraneous offenses do not rise to that level of constitutional harm.

Regardless, in the instant case the alleged extraneous offenses themselves were not introduced into evidence, only the medical records within which they appeared. A careful review of the record fails to demonstrate that the introduction of the complained-of evidence had a substantial and injurious effect or influence in determining the jury's verdict under *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). Petitioner is not entitled to habeas relief under his arguments arising from the medical records.

Nor did petitioner object to the testimony of Hampton and Anderson as constituting inadmissible extraneous offense evidence. Petitioner neither argues nor shows cause and actual prejudice for the default or a fundamental miscarriage of justice. To the extent he contends that trial counsel's deficient performance caused the default, this Court addresses his argument under Part VIII, *infra*. As to Hampton's and Anderson's testimony of petitioner's prior acts of violence against complainant, the record shows that the State made a strong showing that petitioner committed such acts and that they were rationally connected

19

with the offense charged. *Story*, 920 F.2d at 1254. No error of federal constitutional dimension is shown, and respondent is entitled to summary judgment on these issues.

### VIII.   INEFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. U.S. CONST. amend. VI. A federal habeas corpus petitioner's claim that he was denied effective assistance of counsel is measured by the standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984). To assert a successful ineffectiveness claim, a petitioner must establish both constitutionally deficient performance by counsel and actual prejudice as a result of counsel's deficient performance. *Id.* at 687. The failure to demonstrate either deficient performance or actual prejudice is fatal to an ineffective assistance claim. *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).

A counsel's performance is deficient if it falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. In determining whether counsel's performance was deficient, judicial scrutiny must be highly deferential, with a strong presumption in favor of finding that trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy. *West v. Johnson*, 92 F.3d 1385, 1400 (5th Cir. 1996). To overcome this presumption, a petitioner must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). However, a mere error by counsel, even if

20

professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Strickland,* 466 U.S. at 691.

Actual prejudice from a deficiency is shown if there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Id.* at 694. To determine prejudice, the question focuses on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). In that regard, unreliability or unfairness does not result if the ineffectiveness does not deprive the petitioner of any substantive or procedural right to which he is entitled. *Id.*

Persons convicted of a crime also are entitled to effective assistance of counsel on direct appeal. *Evitts v. Lucey,* 469 U.S. 387 (1985). This Court reviews counsel's appellate performance under the *Strickland* standards. *See Goodwin v. Johnson,* 132 F.3d 162, 170 (5th Cir. 1998). Petitioner must allege and present facts that, if proven, would show that his appellate counsel's representation was deficient and that the deficient performance caused him prejudice. *See Strickland,* 466 U.S. at 687-88, 692; *Jones v. Jones,* 163 F.3d 285, 300 (5th Cir. 1998). Effective assistance of appellate counsel does not mean that counsel will raise every available nonfrivolous ground for appeal. *Evitts,* 469 U.S. at 394; *West,* 92 F.3d at 1396. Nor will counsel be deficient for failing to pursue a frivolous point. *Williamson*, 183 F.3d at 462. Rather, it means, as it does at trial, that counsel performs in a reasonably effective manner. *Evitts,* 469 U.S. at 394. A reasonable attorney has an obligation to

research relevant facts and law and make informed decisions as to whether avenues will, or will not, prove fruitful.  *Strickland,* 466 U.S. at 690-91.

## A.    Trial Counsel

In his petition, petitioner asserts that trial counsel "committed errors of constitutional magnitude through critical stages of the judicial process."  (Docket Entry No. 1, p. 7.)  In his state habeas memorandum of law, petitioner identified the following specific deficiencies of trial counsel:

> (a)    failure to investigate and present scientific evidence to rebut evidence presented by the Houston crime lab;
>
> (b)    failure to challenge his warrantless arrest and evidence obtained from the arrest for lack of probable cause;
>
> (c)    failure to present alibi witnesses; and
>
> (d)    failure to object to extraneous offense evidence.

In denying habeas relief, the state trial court made the following relevant findings:

> 3.    Applicant fails to show that counsel's conduct fell below an objective standard of reasonableness and that, but for counsel's alleged deficient conduct, there is a reasonable probability that the result of the proceeding would have been different.
>
> 4.    Applicant fails to show any error on the part of trial counsel for not objecting to the evidence in question.
>
> 5.    Applicant fails to show his counsel was ineffective for not investigating witnesses because he fails to meet his burden of identifying potential witnesses, showing they were available, and showing how the witnesses' testimony would have benefited him.

22

*Ex parte Harris*, p. 143 (citations omitted).  Each of petitioner's alleged deficiencies of counsel will be addressed below.

### Scientific Evidence

The state habeas record shows that in complaining of counsel's failure to obtain scientific rebuttal evidence, petitioner did nothing more than surmise that further investigation would have revealed "severe problems" with the Houston Crime Lab, that technicians involved on his case subsequently were "suspended for mistakes," and that an independent lab analysis would have exonerated him and shown that the real murderer may have been complainant's boyfriend, an assistant district attorney for Galveston County.

Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy, and counsel is entitled to a presumption that his performance was adequate.  *Wilkerson v. Cain,* 233 F.3d 886, 892-93 (5th Cir. 2000). To demonstrate the required *Strickland* prejudice on his claim of ineffective assistance based on uncalled witnesses, petitioner must show not only that the testimony would have been favorable, but also that the witness would have testified at trial.  *Evans*, 285 F.3d at 377. Petitioner presented no probative evidence of what an expert would have stated, or what results the scientific tests would have yielded.  His unsupported claims of an uncalled expert witness are speculative, conclusory, and insufficient to establish ineffective assistance of counsel.  *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001).  Petitioner further fails to demonstrate a reasonable probability that, but for counsel's failure to request and obtain

23

an expert, the jury would have had a reasonable doubt concerning his guilt.  *See Earhart v. Johnson*, 132 F.3d 1062, 1068 (5th Cir. 1998).

Further, none of the DNA samples resulted in evidence showing petitioner as the perpetrator, and, accordingly, he fails to show how additional DNA testing would have established his innocence.  Nor does petitioner rebut the presumed reasonableness of counsel's decision not to pursue further DNA testing.  It would have been reasonable for trial counsel to believe there was an unacceptable risk that further testing of already non-inculpatory DNA samples might result in inculpatory evidence.

Petitioner fails to show that the state court's determination was contrary to or involved an unreasonable application of *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.  No grounds for habeas relief are shown, and respondent is entitled to summary judgment on this issue.

*Alibi Witnesses*

The record further shows that in complaining of counsel's failure to present alibi witnesses, petitioner again presented only conclusory allegations that certain named individuals would have placed him at a barber shop at the time of the offense.  Petitioner fails to show that he informed counsel of these witnesses and that counsel failed or refused to speak with them.  Nor does petitioner present probative summary judgment evidence as to the availability and proposed favorable testimony of these individuals.

24

As previously noted, complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative. *Sayre*, 238 F.3d at 635-36. For petitioner to demonstrate the requisite *Strickland* prejudice, he must show not only that the testimony would have been favorable, but also that the witness would have testified at trial. *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). This he has not done.

The state habeas court rejected petitioner's argument, and found that petitioner "fails to show his counsel was ineffective for not investigating witnesses because he fails to meet his burden of identifying potential witnesses, showing they were available, and showing how the witnesses' testimony would have benefited him." *Ex parte Harris*, pp. 143-44. Petitioner fails to show that the state court's determination was contrary to or involved an unreasonable application of *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. No grounds for habeas relief are shown, and respondent is entitled to summary judgment on this issue.

*Warrantless Arrest*

Petitioner claims that trial counsel failed to challenge evidence obtained during the warrantless and pretextual arrest which was not supported by probable cause. As his sole factual support, petitioner argues that police investigated him based on an anonymous tip. *Ex parte Harris*, p. 106. The record shows that this "anonymous tip" was provided by the two witnesses who observed the black male at complainant's apartment complex carry and

25

place the suspicious-looking bundle in his vehicle.  The witnesses volunteered their observations  and the vehicle's license plate number to the police.  The police determined through public records that the vehicle was registered to petitioner.  Petitioner admits in his briefing that he already was being detained at the Texas City Police Department on two charges of forgery when he was approached by police regarding complainant's disappearance.  *Id*.

Regardless, the record shows through the testimony of officer Brian T. Goetscheius that a warrant had been issued for petitioner's arrest.  S.F. Vol. 9, pp. 158-59.  Petitioner fails to show either factually or legally that had counsel objected to the arrest or challenged the arrest warrant for lack of probable cause, the objection would have been sustained.  Trial counsel is not ineffective in failing to raise groundless objections.  Accordingly, petitioner's conclusory allegations establish neither deficient performance nor prejudice under *Strickland*.

The state habeas court denied relief on this issue, and found that petitioner failed to show any error on the part of trial counsel for not objecting to the evidence in question. Petitioner fails to show that the state court's determination was contrary to or involved an unreasonable application of *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.  No grounds for habeas relief are shown, and respondent is entitled to summary judgment on this issue.

*Extraneous Offenses*

In his state habeas memorandum of law, petitioner complains that trial counsel failed to object to Lashauna Hampton's testimony regarding petitioner's physical violence against complainant. *Ex parte Harris*, p. 115. As noted by the state appellate court in its opinion and as shown by the record, Hampton testified that over a period of three years, Harris assaulted and injured complainant on several occasions. These injuries included a black eye, bruises on complainant's arms and marks on her neck and back where petitioner had scratched her. Hampton also told the jury that petitioner had previously choked complainant until she passed out and that he had struck her with a telephone. *Harris*, 133 S.W.3d at 769. Complainant further told Anderson, an assistant criminal district attorney from Galveston County, about prior occasions when petitioner had assaulted her in the couple's household. *Id*. at 770.

The trial court overruled petitioner's objection that Anderson's testimony was inadmissible hearsay. On direct appeal, the state court agreed that Anderson's "generic" testimony was erroneously admitted, but found it harmless error in light of Hampton's "more detailed" testimony. *Id*. at 773. Petitioner contends that had trial counsel objected to Hampton's testimony as extraneous offense evidence, it would have been excluded and Anderson's testimony would have constituted reversible error.

In rejecting this argument, the state habeas court found that petitioner failed to show any error by trial counsel for not objecting to the evidence. *Ex parte Harris*, p. 143. In his

27

response to the motion for summary judgment, petitioner fails to set forth any legal support for his argument that Hampton's testimony was inadmissible extraneous offense evidence under state law.  In his memorandum of law filed with the state habeas court, petitioner relied on *Ex parte Raborn*, 658 S.W.2d 602 (Tex. Crim. App. 1983).  *Raborn* does not address the admissibility of evidence and provides no support for petitioner's deficient performance argument.  Petitioner fails to show that the trial court would have granted an objection to the evidence as inadmissible extraneous offense evidence under state law.  Counsel is not deficient in failing to raise groundless objections, and no deficient performance is shown in the instant case.  *See Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990).

Petitioner fails to show that the state court's determination was contrary to or involved an unreasonable application of *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.  No grounds for habeas relief are shown, and respondent is entitled to summary judgment on this issue.

## B.    Appellate Counsel

In his response to the motion for summary judgment, petitioner asserts that appellate counsel failed to challenge the denial of his motion for new trial or present in the motion for new trial the existence of newly discovered alibi evidence.  He further claims that counsel failed to raise "obvious" errors in the record.  *Ex parte Harris*, p. 119.

Petitioner, through counsel, fails to set forth any argument or authority in support of these claims, and instead refers the Court to his *pro se* state habeas memorandum of law.

(Docket Entry No. 20, pp. 21-22.)  In his state habeas memorandum of law, petitioner argued that

> appeal counsel also had knowledge of newly discovered evidence pertaining to witnesses whom Applicant Harris made known to counsel.  Witnesses could have established by their affidavits or personal recollections Applicant's whereabouts at the time of the alleged crime, giving Applicant an alibi.  Thus, rendering it impossible for Applicant Harris to have been the perpetrator of this crime.

*Ex parte Harris*, p. 119.  In denying habeas relief, the state trial court found that petitioner failed to show that the conduct of appellate counsel fell below an objective standard of reasonableness and that, but for counsel's alleged deficient conduct, there was a reasonable probability that the result of the proceeding would have been different.  *Id*., p. 144.

Petitioner presents no probative summary judgment evidence establishing the existence of newly-discovered alibi evidence, and the record provides no factual support for his assertion that after his conviction he discovered previously-unavailable alibi evidence.  His conclusory allegations are unsupported in the record and insufficient to raise a material fact issue precluding summary judgment.

Petitioner further fails to establish that had appellate counsel challenged the denial of his motion for new trial, or raised meritorious but omitted issues, the result of his appeal would have been different.  Because an appellate counsel is not required to raise every non-frivolous claim on appeal, but may select from among them in order to maximize the likelihood of success on appeal, it is difficult to demonstrate the incompetency of counsel

when, as here, a brief on the merits is filed.  *See Smith v. Robbins*, 528 U.S. 259, 288 (2000). The presumption of competency is overcome "only when ignored issues are clearly stronger than those presented."  *Id.*

In his state habeas memorandum of law, petitioner complains that appellate counsel should have raised issues of ineffective trial counsel.  It already has been determined that petitioner failed to establish ineffective assistance of trial counsel.  Petitioner also fails to establish that had appellate counsel challenged the denial of a new trial, the result of the appeal would have been different.  His allegations of "obvious error" regarding the motions for new trial are conclusory, unsupported by the record, and insufficient to raise a material fact issue precluding summary judgment.

Petitioner fails to show that the state court's determination was contrary to or involved an unreasonable application of *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.  No grounds for habeas relief are shown, and respondent is entitled to summary judgment on this issue.

## IX.  CONCLUSION

Respondent's motion for summary judgment (Docket Entry No. 17) is **GRANTED**. The petition for a writ of habeas corpus is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.  A certificate of appealability is **DENIED**.  Any and all pending motions are **DENIED** as moot.

The Clerk will provide a copy of this order to the parties.

Signed at Houston, Texas, on February 8, 2007.

_____
Gray H. Miller
United States District Judge